RECEIVED

APR 11   5 00 AM '05

U.S. BANKR...
EASTERN DIS...
NEW YORK

The United States Bankruptcy Court,
Eastern District of New York, Located at
The Alfonse M. D'Amato Courthouse,
290 Federal Plaza, Courtroom 960,
Central Islip, New York 11722, in front of
The Honorable Melanie L. Cyganowski,
on April 12, 2005 at 10:00 a.m.

PRESENT:  HON. MELANIE L. CYGANOWSKI

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

In Re:                                                    Chapter 7
                                                          Case No.: 804-82632-511
MICHAEL MOROKNEK,


          Debtor.                                         Hon. Melanie L. Cyganowski


---------------------------------------------------------------------X
VIVIAN MOROKNEK,

          Plaintiff,                                      Adversary Proceeding No.: 804-8554-511

     -against-

MICHAEL MOROKNEK,                                         **AFFIDAVIT IN OPPOSITION TO
                                                          ORDER TO SHOW CAUSE**


          Defendant.
---------------------------------------------------------------------X

I, Vivian Moroknek, hereby swear to the truth of the following statements, upon information and belief, under the penalties of perjury:

1.  I am a listed creditor, and the Non-Debtor Spouse of the above debtor. I have been represented by Mr. Glenn Ingoglia since May 2004, and I strongly oppose a granting of this Order to Show Cause as follows:

    (a) I oppose Relieving Mr. Ingoglia as my counsel in this matter, because he presents no reasonable grounds herein for such relief and his presence is vital at the hearing for the Defendant's motion to dismiss my adversary proceeding;

    (b) I oppose Staying the proceedings for any period, because either Mr. Ingoglia will be denied his motion and shall be representing me or I, unable to afford new counsel, shall be forced to continue in this case representing myself pro se and therefore highly disadvantaged;

1

(c) I oppose Granting Mr. Ingoglia a retaining lien on my files or any other of my papers, <u>as he has been  paid in full up to the time of his resignation announcement</u>. Since I do not owe him money at this time, he has no rightful reason to retain my file;

(d) I oppose staying the hearing of the Defendant's motion to dismiss for any longer than Mr. Ingoglia has already affected by the ill-timing of this motion;

(e) I oppose to Extending the trial date;

(f) I oppose Granting Mr. Ingoglia any such other and further relief.

2. Mr. Ingoglia's statement, "The attorney-client relationship has broken down" and this motion for withdrawal, I believe, is really a smokescreen, used here to cover Mr. Ingoglia's reluctance at all costs to allow the adversary proceeding regarding the Defendant's motion to dismiss hearing to go forth with his presence as my attorney, possibly because Mr. Schneider's pending motion to dismiss is based upon a potentially serious failure on the part of Mr. Ingoglia to serve papers as he was supposed to, and a judgment in favor of Mr. Schneider can result in my losing my right to object to the discharge of Mr. Moroknek's fraudulent bankruptcy, due to Mr. Ingoglia's service.  As to his stated reasons for being allowed to withdraw as my counsel in this matter, I respond as follows:

(1) I am 52 years old and fully capable of evaluating my choices without seeking or being unduly influenced by the advice of inexperienced others.  I engaged Mr. Ingoglia to represent me and I always consider his advice before choosing among the various options that have been presented to me.

Many of the statements I write here are corroborated my the enclosed affidavit prepared by Mr. John Cobuzzi, who is included in Mr. Ingoglia's retainer contract. Mr. Cobuzzi was both present to observe and witness many of the events I refer to here, and can also attest to his own personal experience of this matter, in conversations between him and Mr. Ingoglia regarding this case (<u>Exhibit A</u>).

(2) I do not understand how Mr. Ingoglia can swear under penalty of perjury that I "balked at the several settlement"(sic.) when, at his advice and insistence, and at Mr. Pergament's specific request, on December 6, 2004 I submitted a binding proposal of Mr. Ingoglia's sole settlement proposal, *which, coincidentally, at Mr. Ingoglia's vehement insistence, would have included my required withdrawal from the adversary proceeding*, to Mr. Pergament, which Mr. Ingoglia then presented on my behalf and which Mr. Pergament then rejected.  I admit to personally preferring the option of settling the Trustee's motion regarding my home with Mr. Pergament as a separate matter from the divorce, and that I do not understand or favor withdrawing from my adversary suit as Mr. Ingoglia advised, with no stated reason from him for so advising, but that settlement with the Trustee was made long after I initially followed Mr. Ingoglia's advice regarding settlement. Mr. Ingoglia balked at my choosing the option to settle with the Trustee after Mr. Pergament rejected his settlement proposal on December 6, and he even refused to submit my offer to settle with Mr. Pergament at that time, threatening instead to withdraw immediately if I insisted on settling the Trustee's motion separately and thereby forcing things to a hold by having a mandatory stay put on all proceedings by his withdrawal, much as

2

he has currently done with the Defendant's Motion to Dismiss which was scheduled for hearing on April 12. I believe he took that position because my separate settlement with Mr. Pergament meant that the adversary motion would then proceed and I believe that Mr. Ingoglia hoped to bury his errors within a universal settlement rather than be answerable for his actions in the hearing for the Defendant's Motion to Dismiss.

(3) I have always paid Mr. Ingoglia <u>on time and in full</u> up to February 28, 2005, and I had never refused to pay him as of the time he notified me of his resignation, on March 5. In spite of my current financial emergency situation, and at my insistence, Mr. Ingoglia, Mr. Cobuzzi and I set up a payment arrangement on March 3, in which Mr. Cobuzzi and I agreed to pay $1,500.00 of the $3,250.00 that would have been due under the contract agreement (representing 46%) by March 5, (<u>Exhibit A</u>) and to set up a payment schedule for my balance, because I would not owe another payment to Mr. Ingoglia again under our contract schedule until next June, and Mr. Cobuzzi was continuing to pay as per his part of the agreement. When we arrived on March 5 to pay Mr. Ingoglia, and to sign the long overdue contempt motion against Mr. Moroknek for the $16,000.00 he owes to me and the household creditors since he filed for Bankruptcy last April, as Mr. Ingoglia promised, he surprised us by announcing instead that he was withdrawing as my attorney as of that day! He did not prepare the contempt motion, which I had been awaiting since December, 2004, as he had promised, and his withdrawal motion, which was submitted in State Court on March 14, is still pending decision at this writing. The stay he imposed there has now allowed Mr. Moroknek impunity with regard to his continued contempt of the pendente lite order and this will cause me a financial nightmare until the stay is lifted. It should be noted that although Mr. Ingoglia announced his resignation in court before Judge Ross on March 7, Mr. Ingoglia curiously did not notify this Federal Court until April 7, 2005, and timed it so that he could conveniently have a stay placed upon the hearing that was scheduled for April 12. Had Mr. Ingoglia presented this Order to Show Cause, which is materially equivalent in content to the Order presented instate Court, this matter could have been decided in sufficient time so as to not have to delay the April 12 hearing. I believe Mr. Ingoglia does not wish to be in court when Mr. Schneider's Motion to Dismiss is heard.

3. In February 2004, a hearing was completed in NYS Supreme Court to determine Mr. Moroknek's contempt of a pendente lite order for $42,000.00, but an eleventh-hour settlement offer from Mr. Moroknek delayed the final decision by Judge DeMaro, so that the divorce could settle. The outline was submitted for the record (<u>Exhibit B</u>), awarding me ownership of our house, in which I reside, and giving Mr. Moroknek sole ownership of our accounting practice, and the stipulation was drafted and reviewed, with a signing date set for April 21, 2004. However, Mr. Moroknek filed for Voluntary Chapter 7 Bankruptcy on April 20,2004, right after the busiest income-producing months of his accounting year, and so avoided both having to settle the divorce and serving the 30-day sentence that is still currently pending under the Federal stay granted in a bankruptcy proceeding with the added bonus of a possibility that his filing could result in my losing my home to the Federal Government to pay for his bills.

4. Point 4 is history and accurate.

3

5. Point 5 is history and accurate.

6. Point 6, is history and accurate.

7. Mr. Ingoglia initially refused to allow me to choose my option to settle the Trustee's motion as I wished to on December 6, when the Trustee offered to settle with me for $170,000.00. Instead, on December 6, Mr. Ingoglia threatened to withdraw if I insisted upon settling, and stated he would do it without first acceding to my choice, thus causing me to be unable to negotiate on my own with the Trustee due to the stay caused by his withdrawal.   Weeks later, Mr. Ingoglia finally negotiated with the Trustee for $175,000.00 so that my taking Mr. Ingoglia's insisted "advice" and delaying settlement with the Trustee did cost me an additional $5,000.00 in debt to acquire my home.  Due to the damage done to my credit by the Debtor's refusal to pay the mortgage as ordered, my family rallied to loan me this amount until I can obtain a second mortgage.  Mr. Ingoglia's objection to my settling the Trustee's motion separate from the divorce was ultimately so passionate however, that, although I specifically inquired as to the status of the settlement of the Trustee's motion at the beginning of March, Mr. Ingoglia did not inform me that on February 28, 2005, Mr. Pergament had sent my house papers to him (Exhibit C).  Mr. Ingoglia actually kept them in his possession without notifying me until March 24.  Mr. Ingoglia saw me in his office on March 5 and was with me in State Court on March 7, but did not inform me that those papers were in his possession at either time.  I was not able to register my house with the County for nearly a month as a result.

8. Point 8 is history and accurate.  Mr. Ingoglia has been paid on time and in full throughout our association, up to the announcement of his resignation on March 5, 2005.

9. At the referral of a friend and former dance student of mine, who is an attorney, I first consulted with Mr. Ingoglia several weeks after Mr. Moroknek filed for bankruptcy, when I researched and learned that I needed to file an adversary proceeding to present the evidence that Mr. Moroknek's filing was fraudulent.  At that time, I had already had to borrow several thousand dollars to pay more than $5,000.00 to keep my home from foreclosure as Mr. Moroknek had tried to contrive to have happen along with his bankruptcy filing.

10. Mr. Ingoglia submits this statement erroneously, solely to make it appear that I do not pay for legal fees, although he has always been paid. I personally paid my previous divorce attorney $10,000.00.  As that attorney advised me he would do when I retained him, he has also submitted a motion to have his remaining legal fees be assigned to Mr. Moroknek for payment, and the decision of that motion has been deferred to our divorce trial, which is now set for June 10, 2005.

11. After conferring with Mr. Ingoglia, when I initially retained him to represent me in the bankruptcy, and with his assurance and counsel that it was reasonable to do so, I requested that we focus his hours and attention in the bankruptcy case upon:

    a) Safeguarding my ownership of the home, as it was to be granted to me in the outline of the State Court divorce agreement of February 2004 (Exhibit B) ;

    b) Removing the Federal stay from the divorce proceedings so that my divorce could move forward, which included Mr. Moroknek serving the sentence for contempt as convicted or paying me at least $35,000.00 as directed by Judge DeMaro, and;

4

c) Filing the papers to allow me to protest the discharge of Mr. Moroknek's bankruptcy petition, on the grounds that the information he provided the US Court regarding his income was inconsistent with other tax returns and sworn statements he had made, in NYS Supreme Court as per hearing transcripts, to the IRS and to his disability insurance company under penalty of perjury, for those same years. Based upon the papers I showed to Mr. Ingoglia, that I had also already sent to the Trustee, Mr. Ingoglia assured me that I had good evidence to protest the discharge of this bankruptcy through an Adversary Proceeding (**Exhibit D**).

12. The motion to lift the stay was originally drafted as per my wishes. However, the stay was NOT lifted in it entirety as originally drafted, because Mr. Moroknek's attorney said he would oppose lifting the stay on Michael having to serve his sentence for contempt, and Mr. Ingoglia advised me to accept that he withdraw that portion from his motion. I listened to his advice, and that decision on his part has resulted in allowing Mr. Moroknek to continue without serving his sentence to this day, and to act in contempt of the pendente lite, at his whim, and with impunity.

13. Point 13 is history and accurate.

14. Mr. Ingoglia states here, *under penalty of perjury*, "She assured me at the time that she did not have any income or means of support" and that he, Mr. Ingoglia, "believed the client". If I had actually told him that, how would he expect to ever be able to be paid by me at all? What matrimonial or bankruptcy attorney would ever accept a client if he actually believed that? I never represented myself in that manner and was completely candid with Mr. Ingoglia about my income, which is small. I explained to him that if I was to be able to save enough to pay him on time, it was vital that, if Mr. Moroknek continues to violate the State Supreme Court order to pay for the household carrying costs during his bankruptcy proceedings, Mr. Ingoglia immediately notify the Supreme Court with the appropriate motion for contempt and Mr. Ingoglia had agreed to do so.

15. Point 15 is accurate and is consistent with the retainer he submitted as his Exhibit A.

16. At the time Mr. Ingoglia was retained, the Debtor also owed me over $6,000.00 in mortgage payments and other bills that he had continued to ignore since he filed for bankruptcy, in addition to the $42,000.00 owed at his conviction for contempt. Mr. Moroknek had been trying to force my home into foreclosure.

17. The settlement that Mr. Ingoglia refers to, which included my having to withdraw from my adversary proceeding, was ultimately not acceptable to the Trustee and is completely moot here.

18. Despite noting his disappointment here, Mr. Ingoglia's irrelevant statement does not support a reason for his withdrawal from representing me in this bankruptcy or from the carefully harmful manner in which he has timed and submitted this motion. It was the Trustee's right to reject the proposal.

19. Mr. Ingoglia states here that he "heard a rumor", asked about it, and, "never received an answer" he, "was satisfied with." I do not believe that an unconfirmed rumor is grounds for an attorney to withdraw from a case, coincidentally right at the point of a hearing where he may to be held accountable for a possibly very serious error that might cause his client to

5

lose her right to her adversary proceeding. I have always considered Mr. Ingoglia's advice when choosing among my options and my choices, and when they have differed from his recommended course of action, my choices are my own, made after due consideration.

20. Regarding this statement, which is also irrelevant to Mr. Ingoglia's withdrawal motion in this Court, it was in December 2004, with $11,000.00 in unpaid household, mortgage and utility bills and arrears, and no heating fuel in freezing weather, when I contacted Mr. Ingoglia to have him file an emergency motion against Mr. Moroknek for contempt, which Mr. Ingoglia inexplicably refused to do. As a result of this, Mr. Moroknek has now continued to ignore bills with impunity until, by the end of February, the total of post petition bills, maintenance and arrears ignored by Mr. Moroknek totaled over $16,000.00. I therefore find it confusing why Mr. Ingoglia would make the kind of transparent (and also untrue) statement here about Mr. Moroknek making a mortgage payment, that is the sort of statement one might expect to hear from Mr. Moroknek's own divorce attorney, to support Mr. Ingoglia's own refusal to file a needed motion for his client who was, and still is, in emergency financial straits. Although Mr. Ingoglia had finally promised to have the completed motion for contempt on March 5, 2005, he instead resigned that day as my attorney, and the stay he had placed upon my case by his motion in State Court continues to allow those bills to accrue with impunity to Mr. Moroknek. Any sense of helplessness or frustration that I might currently experience about this has nothing to do with the State Court adjourning anything.

21. Mr. Ingoglia's advice made no sense to me at the time, when as a result of his refusal to file the motion for contempt in December, I had to then take about $1,400.00 from the money I was accruing for legal fees, to pay for heating fuel so my pipes would not freeze. I desperately needed my counsel's help then. Given Judge Ross's suggestion to him when we were in court and the bills were mentioned for the record, that Mr. Ingoglia should properly file a motion so that the Court can hear it, his refusal still confuses me today. It also confused me when one of Mr. Moroknek's attorneys in the divorce, Mr. Imber of Imber & Aiello, appeared at the side of Mr. Ingoglia on the return date of his State Court motion to withdraw. Mr. Imber even tried to speak before the Judge Ross, who reminded him that there was a stay in place, that he had no business in Court that day, and invited him to leave the courtroom. I do not know why he was there at all.

22. I always carry a cell phone with voice mail with me when I travel. Mr. Cobuzzi also carries a cell phone with voicemail and is available on call 24 hours a day, 7 days a week and is a good emergency contact if my cell is out of range. Mr. Ingoglia made no attempt to contact me during the time I was out of town nor did anything new happen during that time. Mr. Moroknek continued to ignore the bills as he had done since the previous fall.

23. When I returned from the business trip, I found that the total in bills and maintenance ignored since Mr. Moroknek filed for bankruptcy now totaled over $16,000.00. Utility bills dated back to September 2004. Heating fuel for the winter had claimed over $2,300.00 out of my own pocket, and Mr. Ingoglia was now due to be paid $2,500.00 by me at the beginning of March. And there was still no contempt motion in place, so there was no mechanism to have the Court take steps to have Mr. Moroknek pay attention to the Court's order. As of March 1, 2005 I now faced $7,500.00 in current household carrying costs and $2,500.00 in legal fees. I therefore I knew that everyone had to be paid in part, and no one was going to be able to be paid in full that month.

6

24. Mr. Ingoglia has always been paid in full as per his contract, by both Mr. Cobuzzi and myself through the end of February 2005, so on March 1, Mr. Ingoglia had no reason to contact either of us about any overdue payments as he claims here. Mr. Cobuzzi told him that he would pay him the current monthly fee of $750.00 when we came to his office as per Mr. Ingoglia's arrangement, on March 5. I told him that I had to pay in part for this month and that I wanted to set up a payment schedule for the balance. Mr. Ingoglia was not happy about this, nor was I happy to be running in debt to all of my creditors, awaiting a contempt motion to notify State Court, but I was honest with him and acted in good faith with regard to our contract.

25. The amount he was to receive on March 5 would have covered 46% of what he was owed and a schedule would have been set up at that time to pay for the balance. Mr. Ingoglia was in the best position of all of my creditors to see that my cash flow was set back on track, by submitting the contempt motion and allowing the court to encourage Mr. Moroknek to meet his financial obligations.

26. Mr. Ingoglia did not need to question me about this as I was candid about my financial situation and he was well aware of his delay in filing the needed contempt motion, which has now resulted in my having to pay for all of the carrying costs of my home.

27. I do not allow myself to carry debt I cannot afford to repay and declined his suggestion. I believe I offered Mr. Ingoglia a fair and reasonable alternative as a payment arrangement. Mr. Ingoglia seems, with his suggestions, to prefer that I pursue a course of action wherein by his advice, I would surely bankrupt my business and exhaust my limited credit and the income I am trying to establish, rather than have him provide the State Court appropriately with the information it requires to be able to enforce its own order.

28. Mr. Ingoglia's suggestion that I borrow money from my 97 year-old retired, blue-collar father in lieu of making my own financial arrangements and setting up a payment schedule with him is inappropriate.

29. Mr. Cobuzzi has always fulfilled his payment agreement as per the contract. He is not involved in the bankruptcy and has no obligation for my debt.

30. I deny making that statement to Mr. Ingoglia.

31. Mr. Ingoglia is obligated under a $20,000.00 contract, so his bills cannot equal anything in excess of that and an itemized statement is irrelevant here. The contract was of his making and there should never have been any need for him to assure me that he, "would see the matter through" as per his contractual obligation.

32. This is obviously not true since Mr. Ingoglia quit on March 5, 2005.

33. I do not see one example in Mr. Ingoglia's motion to support this allegation.

34. This statement by Mr. Ingoglia illustrates why I think his whole motion is a smokescreen for his trying to avoid having to be in court to answer the Debtor's motion to dismiss and be responsible for the judgment to be rendered regarding my adversary proceeding and Mr. Schneider's motion against his actions. In this particular statement, Mr. Ingoglia appears to be resorting to ranting a bit here, blaming me for the Trustee's rejection of his proposal, and insisting upon fabricating an accusation based upon a rumor he claims to have heard. I

7

do not recall his ever advising or warning me about my financial position and I still believe the appropriate way to avert it would have been for him to file the contempt motion as he was told to do by Judge Ross in State Court. On March 5, Mr. Ingoglia, in resigning, declined the payment arrangement we all agreed to on March 3.

35. Since he was first retained to represent me in these bankruptcy proceedings in May 2004, Mr. Ingoglia has already been paid $16,100.00 this year. He should be required to honor his half of the contract agreement and continue to represent me in the bankruptcy. I do not think that he has shown any valid reason for his withdrawal in this motion and there is good reason that he should be present at the next hearing in the adversary proceeding.

36. I ask that the stay be lifted and the action that was postponed by this ill-supported motion be rescheduled for as near a date as possible. Mr. Ingoglia's contract expires in June 2005.

37. I ask that the Court to instruct Mr. Ingoglia to allow me immediate access to my file so that I may review it to determine that, in addition to the house papers he withheld, no additional vital information has been withheld from me.

Dated: _April    11_____, 2005

_____
**VIVIAN MOROKNEK**

Notarized by: _____

CATHERINE ROMANCZYK
Notary Public, State of New York
No. 4763685
Qualified in Suffolk County
Commission Expires ~~Nov. 0, 20~~ 4/30/66

8

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

In Re:                APR 11   5 00 AM '05                          Chapter 7
                                                                    Case No.: 804-82632-511

MICHAEL N. MOROKNEK,
                                                                   
                      Debtor.                                       Hon. Melanie L. Cyganowski


-----------------------------------------------------------------------X

VIVIAN MOROKNEK,

            Plaintiff,

      -against-                                                      <u>REPLY TO AFFIRMATION</u>


MICHAEL N. MOROKNEK,

            Defendant.
-----------------------------------------------------------------------X


**I Vivian Moroknek do hereby affirm the following upon information and belief under the penalties
of perjury:**

1. Mr. Ingoglia notified me of his intention to withdraw as my counsel in
   both the Divorce and the Bankruptcy, at his office, in the presence of Mr.
   John Cobuzzi, on March 5, 2005.  Mr. Ingoglia confirmed this intention in
   State Court on March 7, and was instructed by Judge Ross to submit his
   Order to Show Cause within 7 days. I received a copy of this order on
   March 24, 2005.  I objected to the withdrawal and the decision on this
   motion is pending at this writing.

2. Mr. Ingoglia has delayed his notification to this Federal Court of his
   refusal to represent me for one month with no evident reason for that
   delay.

3. Mr. Ingoglia has tried by various means to thwart the forward motion of
   the hearing of the Debtor's motion to dismiss, which is based upon an
   objection to an action on the part of Mr. Ingoglia.

4. Mr. Ingoglia appears to be using the process of withdrawal to try to avoid
   his responsibility to be present to answer the Debtor's motion to dismiss at
   hearing for reason of Mr. Ingoglia's actions, which was rescheduled for
   April 12, 2005, by delaying his filing of this motion to withdraw as counsel
   for one month after he filed the same motion in New York State Supreme
   Court.

9

5. I have no information regarding a trial of this matter having been scheduled for September 2005, and do not have copies of much that pertains to this case, although I have asked Mr. Ingoglia to provide me with copies of the documents he receives as a matter of course. I have actually had to go to Public Access at the Federal Court building to retrieve copies of some of the documents that Mr. Ingoglia should have sent to me.

6. Should Mr. Ingoglia be allowed to withdraw as my counsel, I will have no money to retain new Counsel and will be forced to represent myself pro se. I am unlearned in matters of process and bankruptcy litigation.

7. Should Mr. Ingoglia be permitted to retain my files, I will not have the information I would need to be able to proceed in this case at all.

8. Should Mr. Ingoglia be permitted to withdraw, I ask that any stay be lifted as I will not be able to seek new counsel and would wish this to move forward.

9. Mr. Ingoglia has failed to demonstrate any valid reason that he should be allowed to withdraw from this case.

WHEREFORE, it is requested that Mr. Ingoglia's Order to Show Cause be denied in its entirety, and no such other and further relief be granted to Mr. Ingoglia.

Dated: _APRIL 11, 2005_

_____
VIVIAN MOROKNEK

Notarized by: _Catherine Romanczyk_

CATHERINE ROMANCZYK
Notary Public, State of New York
No. 4763685
Qualified in Suffolk County
Commission Expires Nov. 8, 20
4/30/06

10